UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM KILOH,

      Plaintiff,

v.                              Case No. 8:04-cv-1741-T-24TGW

HARTFORD LIFE INSURANCE
COMPANY,

      Defendant.

_____/

## ORDER

This cause comes before the Court on the parties' cross-motions for summary judgment and responses thereto.  (Doc. No. 14, 17, 18).

## I.  Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

## II.  Background[1]

This action is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  William Kiloh ("Plaintiff") is challenging Hartford Life Insurance Company's ("Defendant") decision to terminate payment of long-term disability ("LTD") benefits to him.  (Doc. No. 1 at 2).  Plaintiff is a participant, or beneficiary, of an ERISA employee benefit plan funded by a group insurance policy (the "policy") issued by Defendant.  (Id.).  The policy gives Defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the policy. (Doc. No. 1, Exhibit A at 3).

According to the policy, LTD benefits are payable to a participant if: the participant becomes totally disabled as defined in the policy and while insured under the policy; the participant remains totally disabled throughout and beyond the elimination period; and the

---

[1]The Court has construed the facts in the light most favorable to Plaintiff.

participant submits proof of loss satisfactory to Defendant.  (<u>Id</u>. at 13).  The policy defines "totally disabled" as being "prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis."  (<u>Id</u>. at 4).  Eligibility for LTD benefits is conditioned on the participant providing Defendant with satisfactory proof of disability.  (<u>Id</u>. at 19).  Once LTD benefits are being paid to a participant, Defendant may require the participant to provide proof of continued disability.  (<u>Id</u>. at 13, 19).  Defendant has the right to determine whether or not the proof of continued disability is satisfactory.  (<u>Id</u>. at 19).  Payment of LTD benefits stops when a participant is no longer disabled, or when a participant fails to provide proof of continuing disability.  (<u>Id</u>. at 13).

Plaintiff was employed by Tampa Bay Pilots as a Boatman.  His job consisted of operating a pilot boat: he had to climb up and down a ladder to enter and exit the boat and anchor the boat to the dock in all types of weather conditions.  (A.R. H-488-89, 527-30, 806-07).[2]  The 60-foot pilot boat operates alongside a larger vessel, and the boatman must coordinate his movements so that the harbor pilot can enter and exit the pilot boat.  (A.R. H-807).  Plaintiff's duties required him to sit, stand, lift, and climb.  (A.R. H-488-89, 527-30, 806-07).  Plaintiff worked 12-hour shifts, and it was necessary that he be fully alert and not under medication that affected his attention.  (A.R. H-807).  Plaintiff's occupation as a Boatman was "medium" in its physical demands, as classified in the national economy by the U.S. Department of Labor's Dictionary of Occupational Titles.  (A.R. H-527-28).

In November of 1996, Plaintiff stopped working and applied for LTD benefits, claiming a disability due to Hepatitis-C.  (A.R. H-841).  His claim was approved and Defendant paid benefits to him from February 1997 through April 2003.  On May 22, 2002, as part of

---

[2] Citations to the Administrative Record (Doc. No. 15) are indicated with "A.R." followed by the page number.

Defendant's on-going evaluation of Plaintiff's eligibility for benefits, Defendant requested copies of treatment notes from Dr. Kevin Denny, M.D., who was Plaintiff's primary treating physician.  (A.R. H-146, 293).  Defendant received a treatment note, dated January 23, 2002, showing a viral level that, according to Dr. Denny, "suggest[ed] cure" of Plaintiff's Hepatitis-C. (A.R. H-498, 540).  During that office visit, Plaintiff asked Dr. Denny to state that he could not resume working because of the possibility that his Hepatitis-C would return.  (Id.).  Dr. Denny refused, writing "NO" on the treatment note after describing Plaintiff's request.  (Id.).  Dr. Denny's May 2002 notes indicated the presence of degenerative spinal disc disease in Plaintiff and also stated that Plaintiff reported experiencing seasickness.  (H-263).  Dr. Denny's July 2001 notes included assessments of chronic pain syndrome and chronic L-S radiculopathy.  He also noted that Plaintiff was taking narcotic pain relievers (Oxycontin and Oxycodone).  (A.R. H-296-97).  In August of 2002, Plaintiff told Dr. Denny that he could not even perform tasks for one hour while on his pain medication.  (A.R. H-534).

Defendant also received treatment notes from Dr. Marc Reiskind, M.D., who treated Plaintiff for back pain.  (A.R. H-315-19, 521-26, 606-12).  Defendant obtained from Dr. Reiskind reports of Plaintiff's consultations for pain management between January 24 and November 7, 2002.  (Id.).  Dr. Reiskind's notes indicate that during this time, he increased Plaintiff's Oxycontin from 120mg/day to 160mg/day and that Plaintiff was taking Oxy IR as needed.  (Id.).  Plaintiff returned early to Dr. Reiskind on October 15, 2002 and November 7, 2002 because he had used up all of his medication early due to working on his house (prior to the October 15, 2002 visit) and taking care of his kids (prior to the November 7, 2002 visit).  (A.R. H-522-23).

Dr. Reiskind reported impressions of lumbar radiculopathy, post-laminectomy syndrome, chronic pain syndrome, and failed back syndrome.  (A.R. H-315-19, 521-26, 611).  On July 2, 2002, Dr. Reiskind recorded that Plaintiff appeared "fairly comfortable," with "fairly normal mobility."  (A.R. H-526).  On July 30, 2002, Dr. Reiskind found that Plaintiff's pain was "well controlled," that he appeared "comfortable," that his spine had "fairly good range," and that his gait was "normal."  (A.R. H-525).  On November 7, 2002, Dr. Reiskind indicated that Plaintiff had full range of motion of his lumbar spine.  (A.R. H-522).  Plaintiff contends, however, that all of these comments are in the context of his continuing use of pain medication.

The file also includes fragmentary notes of Dr. William Boyd, M.D., who had been treating Plaintiff at least during the early stages of his treatment for Hepatitis-C in 1996 and 1997.  Dr. Boyd noted a significant increase in headaches that coincided with the start of Plaintiff's treatment in December of 1996, although they had subsided somewhat by February 1997.  (A.R. H-701, 750).

After obtaining Plaintiff's medical records from Dr. Denny and Dr. Reiskind, Defendant had an investigator conduct video surveillance of Plaintiff on October 1-4 and November 21-23, 2002.  (A.R. H-558-92).  The investigator furnished Defendant with the surveillance video and a written report of Plaintiff's observed activities.  The following description of the activities documented in the video are taken from the investigator's report (A.R. H-558-92) and from the Independent Medical Report (A.R. H-497-502) of Dr. William Sniger, M.D., who later reviewed and analyzed the video at Defendant's request:

a.   On October 1, 2002, Plaintiff was observed bending at the waist while tying down furniture on a trailer attached to his car.  He later used a large leaf blower in his backyard, "bending at the waist 45˚ while leaning over the small white picket fence

5

blowing debris away using just his right hand, using a sweeping motion back and forth." (A.R. H-561).

b.  On October 2, 2002, Plaintiff was observed "working about 10 hours on his 31' boat." (A.R. H-499). While working on the boat, he: (i) repeatedly bent deeply at the waist; (ii) repeatedly stepped back and forth between the boat and the dock; (iii) carried around a large toolbox; and (iv) repeatedly climbed and descended a ladder to the bridge of the boat. (A.R. H-499-500, 561-70).

c.  On October 3, 2002, Plaintiff was again observed "working on his boat, climbing the ladder up to the flying bridge, descending the ladder, . . . bent over at the waist 90˚ while sitting, and working under the console." (A.R. H-500). He later used a leaf blower in his backyard, and then "[h]e made 25 trips from his car in the driveway to his house in a 35-minute period, carrying two large pictures, a large box, luggage, clothes and various other items," and then "pulled a large garbage can on wheels into the garage." (A.R. H-500-01).

d.  On October 4, 2002, Plaintiff: (i) bent 90˚ at the waist to fold a large dropcloth in his driveway; (ii) used one hand to push the garbage can to the curb; (iii) carried a large case; (iv) carried a box in one hand while using his other hand to push his daughter on a bicycle with training wheels; (v) drove to a bank and a Home Depot store; (vi) unloaded his car, making "approximately 17 trips" between his vehicle and garage and carried "numerous items, including a large heavy mirror." (A.R. H-501). Plaintiff carried the mirror with both hands, pressing the bottom of the mirror against his waist for support, and was able to crouch while carrying it in order to get it under the garage door. He then returned to the car and lifted and carried two large bags,

6

one in each hand.  (A.R. H-577-78).  He also lifted and carried several suitcases and other large items.  (<u>Id</u>.).

e.   Also on October 4, 2002, about 42 minutes after carrying the mirror, Plaintiff departed his garage on a motor scooter.  Because the garage door was partially closed, Plaintiff used his back and shoulders to push the door upward so he could exit the garage on the scooter.  He returned eight minutes later and: (i) pulled, pushed, and maneuvered a large basketball goal in his driveway; (ii) raked his yard; (iii) bent several times to pick up debris from the ground; (iv) swept the driveway; and (v) picked up a shovel and used it to scrape something off of the driveway.  (A.R. H-501, 578-79).

f.   On November 21, 2002, Plaintiff bent at the waist several times to look under the hood of his car.  (A.R. H-501, 594).  He later gave his car a very thorough washing, spraying it repeatedly with a garden hose (which he bent at the waist to pick up) and scrubbing it by hand.  (A.R. H-501, 586).  He then bent at the waist, picked up a rug and shook it out.  (<u>Id</u>.).  About an hour after washing his car, Plaintiff went for a ride on the motor scooter.  When he returned, he was operating the scooter with one hand and pulling a lawn mower with the other, while his son rode behind him as a passenger on the scooter.  (A.R. H-501, 587).  The lawn mower was a manual mower. (A.R. H-501).  He then "spent 40 minutes mowing the lawn, pushing, pulling, grasping, leaning and bending 90˚ at the waist."  (<u>Id</u>.).

g.   On November 22, 2002, Plaintiff went into his backyard using a leaf blower, switching hands as he walked around.  He lifted the leaf blower over a small fence and then blew off the concrete.  (A.R. H-589).

Plaintiff contends, however, that the surveillance was conducted during a time period when he was in the process of moving from one house to another.  (Doc. No. 17 at 5).  Plaintiff also contends that during the time of the move, he was engaging in unusually heavy activity and was also taking unusually high doses of narcotic pain relievers.  (Id.).

On December 5, 2002, Plaintiff was interviewed by an investigator employed by Defendant.  (A.R. H-142-50).  Plaintiff stated that his two treating physicians were Dr. Denny and Dr. Reiskind, and that he was taking the pain medication Oxycontin daily.  (Id.).  In regard to his physical limitations, Plaintiff told the interviewer: (a) that he could not stand longer than 10 or 15 minutes before pain would force him to sit; (b) that he tried not to carry anything heavier than a gallon of milk, because anything heavier could cause an inflammation of his condition; (c) that he was able to bend at the waist "a little bit" if he bent his knees as well, but tried to avoid bending because of the pain it caused his back; and (d) that he suffered from motion sickness such that his "equilibrium [was] off" and he felt "queasy" just watching his son on a merry-go-round.  (A.R. H-146-48).  He stated to the interviewer that the disabling medical conditions that prevented him from returning to work were Hepatitis-C, fatigue, motion sickness, and increased body pain.  (A.R. H-478).

To resolve the discrepancies between Plaintiff's claimed limitations and his observed activities, Defendant forwarded the surveillance video and Plaintiff's medical records for an independent medical review by Dr. William Sniger.  (A.R. H-490-91, 497-502).  Dr. Sniger is Board Certified in Physical Medicine and Rehabilitation, and he is a Fellow of the American Academy of Physical Medicine and Rehabilitation.  (A.R. H-25, 502).  On April 1, 2003, Dr. Sniger issued his report, in which he concluded from the videos that Plaintiff "exhibited a normal, non-antalgic gait with normal stride and cadence.  He exhibited normal ROM [range of

motion] and exceptional flexibility and endurance.  He spent much of the time without a shirt on,

and his physique was typical of a much younger man.  . . . The extensive surveillance video

demonstrated a functional capacity and endurance of a much younger man, and was inconsistent

with his stated limitations."  (A.R. H-502).  From the medical records furnished to him, Dr.

Sniger stated that Plaintiff's "most recent labs [relating to Hepatitis-C] indicate a normal value

for his viral load and normal LFTs," and that these values had "suggested cure" to Dr. Denny.

(Id.).  Dr. Sniger observed that Dr. Reiskind's recent treatment notes indicated "normal gait, full

[range of motion] of the lumbar spine, normal neurological exam, normal reflexes, and no

evidence of radiculopathy."  (Id.).  Dr. Sniger saw "no reports of MRI, CT or x-ray of the back,

indicating any pathology," and he found "no evidence" that Plaintiff's medication "impair[ed]

his function in any way."  (Id.).  He further stated that there was "absolutely no evidence of any

fatigue."  (Id.).

    As part of his review, Dr. Sniger contacted Dr. Denny and Dr. Reiskind to consult with

them regarding Plaintiff's condition.  (A.R. H-499, 503-04).  Dr. Denny stated that he would not

speak to Dr. Sniger because Plaintiff "had instructed him not to do so."  (A.R. H-499).  Dr.

Reiskind, who never viewed the surveillance video, stated that Plaintiff was capable of sedentary

to light work, but that he was not sure about medium work.  (A.R. H-499, 503).  Dr. Reiskind

further stated that Plaintiff had been "performing housing construction work in order to pay

bills."  (A.R. H-503).  Dr. Sniger concluded his report by stating his medical opinion as follows:

> Based upon my review of the medical record and surveillance video, and my
> conversation with [Plaintiff's] physician, it is my medical opinion that [Plaintiff]
> has the functional capacity to perform his own medium level work as a boatman
> on a full-time basis without any restrictions or limitations.

(A.R. H-502).

On May 12, 2003, Defendant informed Plaintiff that he was no longer eligible for continued benefits.  (A.R. H-487-92).  Accordingly, benefit payments were discontinued effective May 1, 2003.  (Id.).

On October 24, 2003, Plaintiff appealed the decision to terminate his benefits.  (A.R. H-423).  Plaintiff stated that he was appealing Defendant's decision due to his suffering from seasickness, memory loss, fatigue, migraine headaches with vision problems, and back, neck, and joint pain that require strong pain medication.  (Id.).   In connection with his appeal, Plaintiff submitted the following medical records for Defendant's consideration:

    a.   records of his emergency admission to St. Anthony's hospital on April 27, 2003 for a migraine headache accompanied by photophobia and nausea.  A physical examination showed elevated blood pressure, and a history of degenerative disc disease was noted.  (A.R. H-408, 417);

    b.   records of consultations between July 1 and October 14, 2003 with Dr. Eric Kramer, M.D. on referral from Dr. Denny as a follow-up to Plaintiff's St. Anthony's visit. (A.R. H-399-400).  Dr. Kramer noted Plaintiff's complaints of recurrent "ice pick" migraine headaches and seasickness, accompanied by photophobia, nausea, and vomiting.  (Id.).  He also noted that exhaustive testing, including an MRI head scan, had been conducted but had failed to identify a cause.  (Id.).  The only specific findings of abnormality were "lymph nodes in the left suboccipital subcutaneous tissue [and] mild inflammatory changes in the sinuses."  (Id.).  Dr. Kramer noted that his own neurological exam of Plaintiff was "completely normal."  (Id.).  Dr. Kramer prescribed Pamelor for Plaintiff's migraines.  (Id.).  By the end of July, Plaintiff reported that his headaches had improved, although his fatigue had worsened.  (Id.).

On October 14, 2003, Plaintiff had reported to Dr. Kramer that he had no headaches. (Id.).  On November 13, 2003, in a summary of Plaintiff's previous visits, Dr. Kramer commented: "Unfortunately Mr. Kiloh has a subjective symptom that is compromising his function in his occupation as a sea captain.  While I have not been able to [find an] objective reason for this, I have asked him to stop using caffeine in high quantities.  I have asked him to try and get more non-pharmacological pain relief."  (Id.).;

c.  records of Dr. John S. Morrow, M.D. from August and September of 2003, to whom Dr. Kramer had referred Plaintiff for further tests.  (A.R. H-30).  Dr. Morrow reported that audio and ENG testing had not identified abnormalities.  (Id.).  He also noted, as a part of Plaintiff's history, that Plaintiff had two lumbar spine surgeries in 1998, but Dr. Morrow did not give details.  Plaintiff had reported to him that his interferon therapy "really knocked his hepatitis-C into remission, but the downside is it caused some problems with his vision, his balance, dizziness, vertigo, and even worsening of his back problems and memory loss."  (Id.).  Dr. Morrow further noted that these problems do not occur at home or on dry land, but only when Plaintiff attempted to go out on a boat.  (Id.).;

d.  October 14, 2003 report of Dr. Richard Gans, M.D., of the American Institute of Balance, to whom Dr. Morrow referred Plaintiff for video-oculography and other testing.  (A.R. H-425-26).  Dr. Gans concluded that "all of [Plaintiff's] test results were essentially unremarkable."  (Id.).  Dr. Gans recommended that Plaintiff try scopolamine patches for motion sickness, since the patches had been reported to offer the best relief or amelioration of seasickness.  (Id).  He also noted that "it is quite

possible that since motion sickness is typically more consistent with central
neurologic processing, that his hepatitis could have contributed to the onset of the
motion intolerance." (Id.).;

e.   notes of Dr. Gary Moskovitz, M.D., a Board Certified orthopedic surgeon
specializing in the spine, of findings on examinations performed on November 12 and
26, 2003 and a review of MRIs performed in 2001. (A.R. H-370-74). Dr. Moskovitz
noted that Plaintiff had a history of degenerative disc disease. (A.R. H-371). After a
physical examination on November 12, 2003, Dr. Moskovitz commented: "I cannot
elicit any palpable tenderness in his low back area or his cervical spine. Strength in
his upper extremities and reflexes are normal. His range of motion of the lumbar
spine is good, and I cannot elicit any discomfort. . . . Lower extremity strength and
reflexes are normal." (A.R. H-370). Dr. Moskovitz ordered new MRI and x-ray tests
that were conducted and interpreted on November 26, 2003. (A.R. H-372). He found
that Plaintiff's degenerative disc disease had advanced since 2001. (Id.). Dr.
Moskovitz suggested that Plaintiff consider lumbar epidural steroid injections
through his pain management specialist. (Id.). He thought Plaintiff would not be an
ideal candidate for surgery. (Id.). Dr. Moskovitz stated: "The patient continues to
have persistence of low back symptomology. He has difficulty ambulating for
extended periods of time, increased pain with bending, turning, and twisting. He is
unable to sit for prolonged periods of time. The patient's normal occupation is the
captain of a ship. He has been unable to work at his job and does not think he is able
to work with his current level of low back and neck symptomology. He has requested
that I give him a letter stating such. This is being provided." (Id.). Dr. Moskovitz

12

gave Plaintiff a letter stating that he did "not believe that [Plaintiff] is able to perform the routine duties of his occupation as a sea captain due to his back and neck condition." (A.R. H-387).;

f.  notes of Dr. Edward Chen, M.D., a pain management specialist to whom Plaintiff was referred by Dr. Reiskind, documenting epidural steroid injections he performed on Plaintiff on December 31, 2003, and January 15, 2004. (A.R. H-375-76). Dr. Chen noted that Plaintiff had been on high doses of narcotics since having a microdisectomy performed in 1997. (Id.). Dr. Chen also noted that Plaintiff had been treated by an acupuncturist, but his pain in his right leg had worsened two weeks after his acupuncture treatment. (Id.). Dr. Chen's diagnosis was lumbar disc herniation, lumbar radiculopathy, and post-lumbar laminectomy. (Id.).;

g.  report of Dr. Ayaz Virji, M.D., of Plaintiff's March 9, 2004 office visit. (A.R. H-369). Plaintiff was reporting migraines and showed elevated blood pressure. (Id.). Dr. Virji noted blurred vision, and he referred Plaintiff to the Pasadena Eye Center to determine if cataracts were forming. (Id.). Dr. Virji also commented that the elevated blood pressure readings were likely secondary to the headaches. (Id.). Dr. Virji concluded: "Disability. Due to patient's chronic medical conditions, including low back pain regarding chronic narcotic therapy, disabling migraines worsened by being out on a ship, as well as chronic fatigue from his interferon therapy and hepatitis C, I do not recommend that he continue working as a captain piloting vessels. This can be dangerous for himself as well as others involved including crew and other vessels in near proximity." (Id.).

On April 28, 2004, Defendant denied Plaintiff's appeal and upheld the termination of

benefits (A.R. H-351-59), stating:

> In your October 24, 2003 letter of appeal, you indicated that you bought two boats to do private charters; one in September 2001 and another in March 2003.

> \*       \*       \*

> The fact that you purchased and registered at least two vessels while you were out on a disability claim from your own occupation as a Boatman raises questions regarding your reported inability to pilot a boat.

> \*       \*       \*

> The physicians that were treating you at the time [Defendant] was evaluating your request for continued LTD Income benefits prior to the termination decision were unwilling to review relevant evidence at that time.  Dr. Reiskind was unwilling to review video surveillance evidence . . . , although he did report that you were performing housing construction work in order to pay bills.  In addition, Dr. Denny advised Dr. Sniger . . . that he was unwilling to speak with him because you had advised him against this.

> The record suggests that [prior to Defendant's initial decision to terminate LTD benefits] you prevented your then treating physicians from being forthright with an Independent Medical Consultant [Dr. Sniger].  Then, several months after your request for LTD Income benefits was terminated, you sought treatment with new physicians who were willing to provide disability opinions based on your self-reported symptoms.

> [Defendant] does not dispute the fact that you have suffered significant medical events dating back to your original disability date of November 17, 1996.  However, your entitlement to LTD Income benefits is not based merely upon diagnoses.  Rather, it is based upon your level of functionality.

(A.R. H-354, 355, 358).  The present lawsuit followed.

## III.  Standard of Review for ERISA Claims

The United States Supreme Court, in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), set forth the standard of review that a court must apply when reviewing a denial of ERISA benefits: "a denial of benefits . . . is to be reviewed under a *de novo* standard unless

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  The Eleventh Circuit has adopted three standards of review for plan interpretations: (1) *de novo*, applicable where the plan administrator is not afforded discretion, (2) arbitrary and capricious, applicable where the plan grants the administrator discretion, and (3) heightened arbitrary and capricious, applicable where the plan grants the administrator discretion and there is a conflict of interest.  See Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449 (11th Cir. 1997).

In the instant case, the parties do not dispute that Defendant had discretionary authority to determine eligibility for disability benefits and to construe and interpret the terms of the LTD plan.  Additionally, Defendant suffers from a conflict of interest, since it is both the claims determiner and the insurer paying claims from its own assets.  As such, the heightened arbitrary and capricious standard of review applies.

Initially, the Court must evaluate Defendant's decision from the perspective of a *de novo* review and determine whether it is "wrong."  See HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001).  A decision is "wrong" if, after reviewing the administrative record that was before the claims administrator at the time that the decision was made, the Court disagrees with Defendant's decision.  See id. at 993 n.23.

If the Court determines that Defendant's decision was not wrong, the Court's inquiry ends and summary judgment is entered in favor of Defendant.  Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).  If, however, the Court determines that Defendant's decision is wrong, the Court must determine whether Defendant's decision is reasonable.  See HCA Health, 240 F.3d at 994.

15

Since Defendant suffers from a conflict of interest, Defendant's decision is not necessarily entitled to deference if the Court determines that Defendant's decision is wrong, but reasonable.  See id.  Instead, under the heightened arbitrary and capricious standard of review, the burden shifts to Defendant to prove that its decision is not tainted by self-interest.  See id. Defendant can satisfy this burden by showing that its wrong but reasonable decision benefits the class of participants and beneficiaries.  See id. at 994-95.  Even if Defendant satisfies this burden, Plaintiff may still be successful if he can show by other measures that Defendant's decision was arbitrary and capricious.  See id. at 995.  If the Court finds that Defendant fails to show that its decision benefits the class of participants and beneficiaries, Defendant's decision will not be entitled to deference.  See id.

## IV.  Defendant's Motion for Summary Judgment

Defendant moves for the entry of summary judgment in its favor and against Plaintiff on all of his claims.  Defendant argues that its decision to terminate Plaintiff's benefits was correct and that it should be upheld under any standard of review.  Plaintiff responds that Defendant's decision was wrong, and it was not reasonable.  Specifically, Plaintiff argues that Defendant's decision was wrong because: (1) Defendant improperly used limited medical records in making its decision; (2) the surveillance video is meaningless in the context of Plaintiff's claim; (3) Dr. Sniger's opinion was not based on all relevant facts; (4) Defendant erroneously dismissed Plaintiff's documented complaints of severe pain, motion sickness, migraines, and nausea as merely subjective; and (5) Defendant dismissed without consideration the medical records

Plaintiff submitted in support of his appeal.[3]  Accordingly, the Court will consider each argument in determining whether Defendant's decision was wrong.

### A.  Limited Medical Records

Plaintiff first argues that Defendant's decision was wrong because Defendant improperly used limited medical records in making its decision.  Specifically, Plaintiff contends that it was wrong of Defendant to only obtain the medical records of Dr. Denny and Dr. Reiskind when it made its initial decision to terminate Plaintiff's benefits.

This Court finds that Defendant did not improperly make its decision based on limited medical records.  In December of 2002, five months prior to the termination of his benefits, Plaintiff told Defendant's investigator that Dr. Denny and Dr. Reiskind were his only two current treating physicians.

The Court rejects Plaintiff's argument that Defendant's decision to terminate his benefits was wrong because Defendant made no effort to obtain records of any physician who had treated Plaintiff for spinal disc disease, despite the fact that Dr. Denny and Dr. Reiskind's notes indicated that he suffered from spinal disc disease and other problems.  Plaintiff is incorrectly attempting to shift the burden onto Defendant to discover and obtain all relevant medical records.  See Cord v. Reliance Standard Life Ins. Co., 362 F. Supp.2d 480, 486 (D. Del.

---

[3]Plaintiff also argues that Defendant's decision was wrong, because it used the Dictionary of Occupational Titles ("DOT") in lieu of considering the actual duties that Plaintiff performed as a boatman.  The Court, however, rejects this argument.  Defendant did not exclusively rely on the DOT; Defendants states in its original termination letter that it considered the job description for Plaintiff's position that was prepared by his employer.  (A.R. H-488).  Furthermore, it is reasonable for claims administrators to consider the DOT when making disability determinations.  See Richards v. Hartford Life & Accident Ins. Co., 356 F. Supp.2d 1278, 1287 (S.D. Fla. 2004)(citations omitted).

2005)(stating that the administrator did not have a duty to investigate or gather more information); Wadyal v. Metropolitan Life Ins. Co., No. CV02-05815WHA, 2003 WL 22846229 at *3 (N.D. Cal. Nov. 24, 2003); Sell v. Unum Life Ins., No. Civ.A. 01-4851, 2002 WL 31630707 at *7, n.4 (E.D. Pa. Nov. 19, 2002).  Instead, "[w]here a plan participant seeks to challenge the denial of benefits, the ERISA statute imposes on the plan participant the burden of showing that he is entitled to the 'benefits . . . under the terms of his plan.'"  Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996), *affirmed*, 144 F.3d 54 (11th Cir. 1998)(quoting 29 U.S.C. § 1132(a)(1)(B)).  As such, Plaintiff had the burden of proving his continued disability to Defendant.[4]  See Hufford v. Harris Corp., 322 F. Supp.2d 1345, 1360 (M.D. Fla. 2004).  Accordingly, it was Plaintiff's responsibility to make Defendant aware of any treating physician or any medical records that he thought might be helpful in making an informed decision regarding his disability status.

The Court notes that when Defendant informed Plaintiff that it was terminating his benefits in May of 2003, Defendant also informed Plaintiff that it would consider any additional evidence he submitted if he appealed the decision.  (A.R. H-491).  When he appealed the termination decision, Plaintiff submitted numerous medical records that were generated after the initial termination decision; however, he did not submit any medical records generated prior to the termination decision regarding his spinal disc disease, including the MRIs from 2001 that he suggests that Defendant failed to consider.  As such, Plaintiff had the burden to submit the purportedly relevant information, but he failed to do so, even after Defendant invited him to do

---

[4]Additionally, the policy puts the burden on Plaintiff to provide Defendant with satisfactory proof of continued disability.

so.  Since Defendant did not have a duty to discover and obtain all relevant medical records,

Defendant's reliance on Dr. Denny's and Dr. Reiskind's medical records in analyzing whether

Plaintiff was disabled prior to the initial termination decision was proper.

### B.  Surveillance Video

Next Plaintiff argues that Defendant's decision was wrong, because it was based on the

surveillance video.  Specifically, Plaintiff argues that the surveillance video is meaningless in the

context of Plaintiff's claim, because (1) Plaintiff was engaged in an unusually high level of

physical activity and was relying on extra doses of his pain medication, and (2) the activities

captured on the surveillance video were completely unrelated to the activities Plaintiff was

required to perform as a boatman.  The Court rejects these arguments.

Defendant obtained seven days of video surveillance of Plaintiff.  The Court notes that

the use of video surveillance to document a claimant's functional capacity is appropriate under

ERISA.  See Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1274

(11th Cir. 2002); see also Briggs v. Marriott International, Inc., 368 F. Supp.2d 461, 471 (D. Md.

2005)(stating that video surveillance coupled with the opinion of physicians justified the

administrator's conclusion that the claimant was capable of performing his occupation);

DiCamillo v. Liberty Life Assurance Co., 287 F. Supp.2d 616, 624 (D. Md. 2003)(noting that the

surveillance video presented objective evidence of the claimant's ability to perform a variety of

physical tasks, in direct contradiction to his statements to the administrator regarding his

physical limitations); Schindler v. Metropolitan Life Ins. Co., 141 F. Supp.2d 1073, 1081 (M.D.

Fla. 2001)(stating that the claimant's credibility was seriously called into question by the

surveillance video, which showed him engaging in activity that he previously stated that he was

unable to do).

The Court has viewed the surveillance video submitted in this case (Doc. No. 16) and considers it objective evidence that Plaintiff's physical capabilities exceeded the limitations that he described to Defendant's investigator in December of 2002 and to his treating physicians. The videos show Plaintiff working on his boat, riding a scooter, carrying heavy objects, mowing his yard, washing his car, repeatedly bending deeply at the waist, and repeatedly climbing and descending a ladder to the bridge of his boat, all without apparent discomfort. Furthermore, the video was taken over a seven day period, during two different months, and for several hours each day. Plaintiff does not dispute that the video surveillance shows him engaged in these activities; instead, Plaintiff argues that the video surveillance is irrelevant.

Plaintiff argues that he was engaged in an unusually high level of physical activity and was relying on extra doses of his pain medication. Accepting this as true, it does not render the surveillance video meaningless, because the video shows that Plaintiff's physical capabilities exceeded the limitations that he described to Defendant's investigator in December of 2002 and to his treating physicians. For example, in August of 2002 (two months before the first days of surveillance), Plaintiff told Dr. Denny that he could not even perform tasks for one hour while on his pain medication. The videos, however, clearly contradict Plaintiff's statement to Dr. Denny about his physical limitations. Additionally, on December 5, 2002 (less than two weeks after the second surveillance), Plaintiff told Defendant's investigator that he could not stand longer than 10 or 15 minutes before pain would force him to sit. Again, this is contradicted by the video surveillance. Plaintiff also told the investigator that he suffered from motion sickness such that his equilibrium was off and that he felt queasy just watching his son on a merry-go-

round.  However, the video surveillance shows Plaintiff doing work on his boat and riding a motor scoot, which contradict his allegation of motion sickness.  Plaintiff also told the investigator that he tried not to carry anything heavier than a gallon of milk, because anything heavier could cause an inflammation of his condition, and that he was able to bend at the waist "a little bit" if he bent his knees as well, but he tried to avoid bending because of the pain it caused his back.  However, the surveillance video shows Plaintiff carrying items that appear much heavier than a gallon of milk and show him bending, and Plaintiff does not appear to be in pain.

Plaintiff also argues that the activities captured on the surveillance video were completely unrelated to the activities Plaintiff was required to perform as a boatman. Specifically, Plaintiff argues that "[e]very activity he was seen to perform occurred at and around his house, on dry land."  (Doc. No. 17, p14).  The Court rejects this argument, because the surveillance conducted on October 2nd and October 3rd shows Plaintiff working on his boat. Furthermore, while the activities captured on the surveillance video may not be identical to his duties as a boatman, the video is objective evidence that Plaintiff's physical capabilities exceeded that in which he reported to his doctors and Defendant's investigator.  <u>See</u> <u>Schindler</u>, 141 F. Supp.2d at 1081.

Accordingly, the Court rejects Plaintiff's argument that the surveillance video is irrelevant when determining whether he was capable of performing his job as a boatman. Instead, the Court finds that Defendant's reliance on the video, in addition to other evidence, was proper.

**C.  Dr. Sniger's Opinion**

Next Plaintiff argues that Defendant's decision was wrong, because it was based in part on Dr. Sniger's opinion, and his opinion was not based on all of the relevant facts.  Specifically, Plaintiff argues that Dr. Sniger did not have Plaintiff's 2001 MRIs and other medical records relating to his spinal disc disease and other related  problems, and therefore, Dr. Sniger's conclusion that there were "no reports of MRI, CT or x-ray of the back, indicating any pathology" was erroneous.  The Court rejects this argument, because, as stated above, Plaintiff had the duty to submit all relevant medical records that it wanted Defendant to consider.  Dr. Sniger did not ignore any medical records; Plaintiff did not submit the medical records prior to the initial termination decision that he contends that Dr. Sniger failed to consider.

Additionally, Plaintiff argues that Dr. Sniger's opinion was deficient because he gave no consideration to Plaintiff's actual job duties, which required a high level of alertness during a twelve hour shift and the ability to coordinate his boat's movements with those of a larger vessel, as well as the ability to dock his own boat, in all weather conditions.  Plaintiff contends that Dr. Sniger also failed to consider his complaints of seasickness.  The Court rejects these arguments.

It is clear from Dr. Sniger's report that he was analyzing whether Plaintiff "had the functional capacity to perform his own medium level work as a boatman."  (A.R. H-502).  While Dr. Sniger did not separately identify each of Plaintiff's duties, this was likely due to the fact that Dr. Sniger found that Plaintiff did not suffer from any impairments that would restrict or limit him in any way.  Dr. Sniger specifically found that Plaintiff "exhibited a normal, non-antalgic gait with normal stride and cadence.  He exhibited normal ROM [range of motion] and exceptional flexibility and endurance.  . . . The extensive surveillance video demonstrated a

22

functional capacity and endurance of a much younger man, and was inconsistent with his stated limitations." (A.R. H-502). Dr. Sniger observed that Dr. Reiskind's recent treatment notes indicated "normal gait, full [range of motion] of the lumbar spine, normal neurological exam, normal reflexes, and no evidence of radiculopathy." (Id.). Furthermore, Dr. Sniger found that there was "absolutely no evidence of any fatigue." (Id.). Additionally, Dr. Sniger was aware of Plaintiff's "usage of opiates," but he found "no evidence" that Plaintiff's medication "impair[ed] his function in any way."[5] (Id.). While Dr. Sniger did not expressly comment on Plaintiff's allegations of seasickness in his report, the Court notes that the video surveillance shows Plaintiff spending several hours over two days on his boat with no apparent discomfort.

### D. Plaintiff's Subjective Complaints

Plaintiff argues that Defendant's decision was wrong because Defendant erroneously dismissed Plaintiff's documented complaints of severe pain, motion sickness, migraines, and nausea as merely subjective. The Court rejects this argument.

While an administrator cannot automatically disregard subjective complaints, administrators are also not required to automatically give significant weight to all subjective complaints. If administrators were required to accept all subjective complaints that a participant reported to a doctor, long term disability benefits "'would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional.'" Hufford, 322 F. Supp.2d at 1356 (quoting Coffman v. Metro. Life Ins. Co., 217 F. Supp.2d 715, 732 (S.D.W.Va.

---

[5]The Court notes that Plaintiff does not appear to be impaired during the video surveillance, which was a period of time in which Plaintiff claims he was taking a higher dose of narcotics than usual.

2002)).

In this case, Defendant had a good reason for not giving significant weight to Plaintiff's subjective complaints (and the medical opinions based on those subjective complaints)–the video surveillance showed that Plaintiff's physical capabilities exceeded his self-reported limitations, and as such, Defendant found that Plaintiff's credibility was called into question.  See Coffman, 217 F. Supp.2d at 734, n.5 (stating that video surveillance is "of great utility in verifying many components of the subjective self-reporting and the corresponding opinions rendered on such self reporting"); Onofrieti v. Metropolitan Life Ins. Co., 320 F. Supp.2d 1250, 1254 (M.D. Fla. 2004)(stating that the plaintiff had a credibility problem, since the video surveillance contradicted her self-reported limitations).[6]  As such, it was not wrong for Defendant to give less weight to the opinions of the doctors that Plaintiff saw after Defendant's initial termination decision who found that Plaintiff could not work based on his subjective and unreliable complaints of pain, motion sickness, migraines, and nausea.  See Onofrieti, 320 F. Supp.2d at 1255.

**E.  Plaintiff's Additional Medical Records**

Plaintiff argues that Defendant's decision was wrong because Defendant dismissed without consideration the medical records that he submitted in support of his appeal, suggesting that they merely represented a search for a favorable opinion.  Specifically, Dr. Moskovitz and Dr. Virji stated that Plaintiff's medical condition made him unable to perform his own job as a

---

[6]The Court notes that minor inconsistencies between a plaintiff's self-reported limitations and video surveillance do not justify a court discounting a plaintiff's subjective complaints.  See Onofrieti, 320 F. Supp.2d at 1255.  However, in the instant case, the video surveillance did not reveal minor inconsistencies; instead, it showed that Plaintiff's physical capabilities clearly exceeded his self-reported limitations.

24

boatman.  The Court, however, rejects this argument.

The records of Dr. Moskovitz indicate that he saw Plaintiff twice (on November 12th and 26th of 2003).  Dr. Moskovitz stated: "The patient continues to have persistence of low back symptomology.  He has difficulty ambulating for extended periods of time, increased pain with bending, turning, and twisting.  He is unable to sit for prolonged periods of time.  The patient's normal occupation is the captain of a ship.  He has been unable to work at his job and does not think he is able to work with his current level of low back and neck symptomology."  (A.R. H-372).  Dr. Moskovitz gave Plaintiff a letter stating that he did "not believe that [Plaintiff] is able to perform the routine duties of his occupation as a sea captain due to his back and neck condition."  (A.R. H-387).

Dr. Virji, who saw Plaintiff once on March 9, 2004, concluded: "Disability.  Due to patient's chronic medical conditions, including low back pain regarding chronic narcotic therapy, disabling migraines worsened by being out on a ship, as well as chronic fatigue from his interferon therapy and hepatitis C, I do not recommend that he continue working as a captain piloting vessels.  This can be dangerous for himself as well as others involved including crew and other vessels in near proximity." (A.R. H-369).

While Dr. Moskovitz and Dr. Virji both concluded that Plaintiff was unable to perform his job as a boatman, these doctors were relying on Plaintiff's subjective complaints and had not seen the video surveillance of Plaintiff.  Dr. Sniger, who did see the video surveillance of Plaintiff, concluded that Plaintiff was able to perform his job as a boatman.  Defendant was not wrong in giving more weight to Dr. Sniger's opinion than to the opinions of Dr. Moskovitz and Dr. Virji.  As explained by the Supreme Court in <u>Black & Decker Disability Plan v. Nord</u>, 538

U.S. 822, 834 (2003):

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Furthermore, this Court notes that "[i]t is entirely appropriate for an administrator to rely on written reports of consultants [like Dr. Sniger] who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled."  Hufford, 322 F. Supp.2d at 1359 (citations omitted).  In this case, Defendant was not wrong in choosing the more reliable opinion of Dr. Sniger over the opinions of Dr. Moskovitz and Dr. Virji, whom Plaintiff first saw during the period between the initial decision to terminate his benefits and the submission of his appeal.  See Brown v. Blue Cross & Blue Shield of Alabama, Inc., 898 F.2d 1556, 1572 (11th Cir. 1990); see also Wall v. Pennzoil-Quaker States Co., 358 F. Supp.2d 1169, 1177-78 (S.D. Fla. 2004)(granting summary judgment in favor of the administrator where the reviewing doctor determined that the medical records and surveillance video of the claimant showed that he was able to work, despite the fact that the claimant's treating physician opined that the claimant was unable to work).

**V.  Conclusion**

While there is evidence that Plaintiff was diagnosed as having back problems, including degenerative disc disease, a "diagnosis does not by itself establish disability."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2003).  This case does not turn on whether Plaintiff had back problems or suffered back pain and other

symptoms/conditions; this case turns on whether Plaintiff met his burden of showing that his back problems, back pain, and/or other symptoms/conditions rendered him unable to perform his job as a boatman.  See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005). As explained above, this Court concludes that Defendant was not wrong in finding that Plaintiff did not meet his burden.  Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**.

(2)     Plaintiff's Motion for Summary Judgment (Doc. No. 17) is **DENIED**.

(3)     The Clerk is instructed to enter judgment for Defendant and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 31st day of August, 2005.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record